# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00100-CV

---

**Asha Ragazza Gleason, Appellant**

**v.**

**Derek Wayne Heidemeyer, Appellee**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-23-003000, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Asha Ragazza Gleason challenges three provisions in the final decree of divorce signed by the trial court. She asserts that the trial court erred by (1) naming appellee Derek Wayne Heidemeyer as sole managing conservator of their two children, (2) requiring Gleason to complete psychological testing, and (3) requiring Gleason's visitation with the children to be supervised. Because we conclude that the trial court did not abuse its discretion, we affirm.

## BACKGROUND

Gleason and Heidemeyer married in October 2019. They have two children together, a daughter and a son. At the time of trial, their daughter was almost five years old and their son was three years old. Heidemeyer and Gleason separated in September 2022.

**Initial temporary orders and appointment of guardian ad litem**

In April 2023, Heidemeyer filed an "Original Petition for Divorce, Request for Temporary Restraining Order, Request for Extraordinary Relief, and Request for Temporary Orders." He attached a supporting affidavit that described an assault by Gleason on him that occurred in November 2022 in the presence of the children, who were ages one and three at the time. That assault resulted in criminal charges against Gleason that were pending at the time Heidemeyer filed his pleading. Heidemeyer also attested to an attempt in April 2023 by Gleason to remove the children from their daycare that the daycare had reported to him. The daycare had refused to release the children to Gleason and reported to Heidemeyer that they had to ask Gleason to leave because of her loud and rude behavior. Heidemeyer further attested that the next day, Gleason threatened Heidemeyer and his family by sending Heidemeyer's mother a text message stating, "Bitch you and yo family gone get shot up ho[]. Now ya'll got prices on your heads better watch out bitch. Your son is dead. Your going to die bitch and your husband will die all of you are walking dead." Based on the allegations in Heidemeyer's affidavit, the trial court issued an ex parte temporary restraining order against Gleason and set a hearing for temporary orders.

After a contested hearing on the temporary orders in May 2023, at which both Gleason and Heidemeyer were represented by counsel, the trial court appointed the parties temporary joint managing conservators and appointed Heidemeyer as the conservator with the exclusive right to determine the children's primary residence. The trial court further ordered that the children continue their enrollment at their daycare unless the parties jointly agreed to a change and that each conservator ensure the children's attendance at the daycare during their periods of possession. The trial court also ordered that Gleason should have possession of the

2

children under a standard possession order with exchanges at the children's preschool, provided that Gleason was residing with her parents. The trial court also required the parties to communicate exclusively through AppClose and ordered them to each register and complete a cooperative parenting program through the Travis County Domestic Relations Office. The trial court also appointed the Travis County Domestic Relations Office as guardian ad litem to investigate the allegations of family violence and give an opinion as to conservatorship and a schedule for possession and access.

**Agreed temporary orders for Gleason to have supervised possession**

On September 1, 2023, less than four months after the guardian ad litem had been appointed, because of additional concerns about Gleason that had developed, Heidemeyer filed a "Request for Temporary Restraining Order, Request for Extraordinary Relief, Motion for Further Temporary Orders, and Motion to Review Guardian Report." In the motion, Heidemeyer sought to have Gleason temporarily enjoined from exercising possession of or access to the children, or in the alternative, temporarily enjoined from exercising unsupervised possession of or access to the children. He also sought temporary orders ordering that all of Gleason's periods of possession of the children be continuously supervised and that he have the exclusive right to make decisions regarding the children's medical care and education. He further requested that the court allow the guardian ad litem to make an interim report to the court recommending that Gleason's periods of possession be supervised.

Heidemeyer's motion was supported by his own affidavit and an affidavit from the guardian ad litem, Suzan Bayar. In Heidemeyer's affidavit, he attested that Gleason had exercised her right to visitation with the children only two or three times after the temporary

orders were signed, and she had not seen the children in almost 90 days. Heidemeyer explained that he had "concerns for the children's safety due to [Gleason's] behavior and mental health" since her last visit, based on her communications with him and Bayar.

Heidemeyer described how Gleason repeatedly deleted the AppClose phone app and continued to attempt to call and text him on his cell phone, despite the trial court's order that the parties were to communicate exclusively through AppClose. He described a threatening phone call and harassing text messages he received from Gleason. Those messages included threats that she planned to take the children and not return them for a month and that she planned to take the children from daycare outside of her period of possession. He was concerned that Gleason planned to kidnap the children because she had stated to Bayar that she would not return the children the following week after her period of possession. Heidemeyer also expressed his concern that Gleason was not living with her parents as the trial court had ordered as a condition of her possession of the children because Gleason had continually refused to allow Bayar to visit her parents' home. In her supporting affidavit, Bayar stated her support for the relief requested by Heidemeyer in his motion. She attested that she had "concerns about the safety and wellbeing of the children in Ms. Gleason's care if her periods of possession are not supervised." She further stated her intent to file a report recommending supervised possession before a temporary-orders hearing.

The trial court issued an ex parte temporary restraining order and order setting a hearing for further temporary orders on the day Gleason filed the motion. After Gleason was served with that order, the parties agreed to terms for "Agreed Further Temporary Orders," which were later incorporated into an order signed by the trial court on November 1, 2023. As part of the Agreed Further Temporary Orders, Heidemeyer was appointed temporary sole

4

managing conservator and Gleason was appointed temporary possessory conservator. The Agreed Further Temporary Orders ordered that Gleason would have four three-hour visits supervised by a Domestic Relations Office provider on four specified dates, with the time to be set by the supervisor and a subsequent assessment and recommendations to be made by Bayar about Gleason's future periods of possession. Gleason agreed and was ordered to complete a psychological evaluation within 60 days of the court's signing of the order. The court again ordered the parties to communicate exclusively through AppClose and enjoined Gleason from communicating with Heidemeyer through phone calls or text messages, absent an emergency when she was in possession of the children. Gleason signed the Agreed Further Temporary Orders.

**Guardian ad litem's child-custody evaluation**

Eleven months later, in October 2024, Bayar filed her child-custody evaluation a few days before the final trial. In the child-custody evaluation, Bayar set forth her concerns about Gleason's "behavior, responsiveness to Mr. Heidemeyer, and lack of contact with the children," and about Gleason's "untreated mental health issues."

Bayar stated that "Gleason reported struggling with depression after she had [their older child]." Although Gleason was put on medication for depression, she reported that it made her feel suicidal so she stopped taking it. Bayar noted that Gleason had never completed the court-ordered psychological evaluation, even after Bayar had provided the names of alternative providers for a regular psychological evaluation due to the expense of forensic psychological evaluations. Bayar explained that she continued to have the same concerns that she had at the hearing the prior year on the second temporary orders: "[Gleason] has not seen the children for

an extended period; she has been aggressive with Mr. Heidemeyer on at least two occasions; and . . . she does not feel she needs to follow court orders." Bayar stated that she is unclear whether Gleason does not follow court orders or rules because she "just didn't understand them or if this is a manifestation of mental health issues." Bayar provided specific examples of Gleason's issues with following court orders and rules related to the visitations.

Bayar also reported that Gleason had not seen the children consistently over the summer of 2023. She did not see the children at all in July 2023 but called Heidemeyer and wanted them the whole month of August. Bayar explained, "[o]nce the visits became supervised the plan was to assess her interactions with the children after she re-established her relationship with them." Bayar also described Gleason's behavior at the supervised visits. She would not bring a diaper bag to the visits, despite being instructed to do so by the visit supervisor. Gleason "was consistently late to visits," would attempt to change the visit location after making arrangements with the visit supervisor about a location, and left two of the visits to go to the store to get diapers and cake, leaving the children with other family members who were present. She was not home at the beginning of a third visit because she went to get a cake; she was gone for an hour and a half and missed half of the visit. Because of Gleason's inconsistency with the visits, she never got to the point where Bayar could recommend unsupervised visits. The last time that Gleason had a visit with the children was December 23, 2023.

Bayar explained that although Gleason at first was cooperative and would call her, Gleason became "frustrated with the process and with supervised visits." By mid-August 2023, Gleason had emailed Bayar to tell her she had deleted AppClose and that she was "not going along with any of this im done" and that she was no longer available for the home visit or "for any of this." She also reported to Bayar that "she was going to get her children and keep

them, and that she didn't care what anyone has to say anymore." However, after that, Gleason emailed her again and they attempted to schedule a home visit. After Bayar had to reschedule, she never received a response from Gleason verifying the day or time for the rescheduled visit. In September 2024, Bayar again attempted to schedule a home visit and asked if Gleason had engaged in services. More than two weeks later, Gleason responded, "asking why I wanted to do a home visit or need information."

In contrast, Bayar reported that Heidemeyer "is cooperative with the process and provided any information requested. He has met the children's physical and emotional needs." Bayar stated that he was also cooperative with the visitation supervisor in arranging for Gleason to have visitation.

Bayar also described each party's criminal history. Heidemeyer does not have a criminal history. In addition to Gleason's November 2022 assault on Heidemeyer, the police had been called out to Gleason's parents' home at least ten times because of incidents between Gleason and her sister. In April 2023, a report was received about abuse of 911, and Gleason was the suspect. She had called 911 asserting that she had heard shots and seen a flash of gunfire inside Heidemeyer's home, but when the police arrived, they saw no indication of gunfire.

Bayar recommended that Heidemeyer be named sole managing conservator, Gleason be named the possessory conservator, and Heidemeyer be given the right to determine the children's primary residence within Travis County and Williamson County. Bayar recommended that Gleason have a step-up possession schedule with a five-step plan, starting with supervised possession and ending with a standard possession order. As the first step of that plan, Bayar recommended that Gleason complete a psychological evaluation, sign HIPAA releases so that Heidemeyer could obtain the recommendations from the evaluation, and attend at

7

least 90% of the visits in a six-month period to progress to the next step. Bayar also recommended that Gleason participate in therapy until successfully discharged and that Heidemeyer be able to request up to six alcohol and drug tests in a year, with testing to be discontinued if Gleason is negative for a year.

**Final trial**

The trial court conducted a bench trial in October 2024 at which the parties and several witnesses testified. In addition to Heidemeyer and Gleason, the court heard testimony from the owner of the third-party company that supervised the possession periods, Gleason's parents and sister, Heidemeyer's mother, and Bayar. Bayar testified to the matters reported in her child-custody evaluation, including her concerns about Gleason's mental health and her inability to parent the children alone as demonstrated by her behavior at the few supervised visits. The trial court heard testimony from Heidemeyer about Gleason's November 2022 assault on Heidemeyer and two other incidents in July 2022 and September 2023 when Gleason physically assaulted him, threatening messages Gleason sent him, and his knowledge of her drug and alcohol use. He also testified that he had concerns about her mental health because Gleason told him that she had attempted suicide by overdosing on medication during an episode of postpartum depression before he knew her.[1] She also had once grabbed a gun and threatened suicide in his presence.

After the close of the evidence, after discussing with Gleason the importance of her having a psychological evaluation done so that the trial court could see the results of the

---

[1] Gleason has an older son who has a different father. Bayar reported in the child-custody evaluation that it is unclear how often that child is with Gleason and whether he is living with her full time. Gleason reported to Bayar that she had custody of him but his father had taken him.

8

evaluation to make some decisions about supervised visitation, the trial court initially indicated that the parties would be named joint managing conservators. The trial court admonished Gleason as follows:

> [B]ut Ms. Gleason, you're going to need to do a lot of work, okay. I'm granting you joint managing conservator because I think that's in the best interest of your kids, and because your kids need you in their life, but there is going to be a long period of time before you have kind of regular visits that you probably are looking for.
>
> We're going to have to work because your kids haven't seen you in so long, and you're going to have to be willing to do that work.
>
> Are you willing to do that work?

Although Gleason answered, "Yes," she then proceeded to repeatedly question and challenge the trial court's rulings. The trial court spent over an hour stating its rulings and explaining to Gleason the importance of getting the psychological evaluation and the ways in which Gleason had not complied with the temporary orders, as well as explaining to the parties the modifications the court was making to the step-up possession schedule recommended by Bayar, the details of how the step-up possession schedule would work, and the order enjoining both parents from consuming alcohol or illegal drugs while in possession of the children. During portions of the trial court's explanations, Gleason repeatedly questioned why the trial court was ruling against her, and the trial court explained several times that the rulings were based on the evidence that the court had heard and considered, including all of the testimony and admitted exhibits. Towards the end of the trial court's statement of its rulings, when the trial court was ruling on who Gleason should use for the psychological evaluation, Gleason became argumentative with the court, stating, "I can find my own. I don't want to be anywhere [Bayar]

recommends. I will not do a psych evaluation with any doctor she recommends." The trial court proceeded with its ruling on the practice that Gleason was to use for the psychological evaluation. Gleason again became argumentative with the court while the court was ruling that Gleason would be required to provide to Heidemeyer through AppClose 24-hour advance confirmation of her intent to exercise her scheduled possession. Gleason stated, "I'm not going to communicate with him" and argued with the court about whether she should have to text him to confirm visits. After the court stated, "These two parents have to communicate because these children have to grow up under court orders and so if Ms. Gleason cannot provide the courtesy of a 24-hour notice that she's going to exercise visitation, then she does not get the visitation," and Gleason's mother began speaking, there was a disturbance in the courtroom. The court's deputy asked for "[q]uiet in the courtroom," and both the trial court and the deputy asked someone to sit down. The trial court continued stating its ruling on the visit-confirmation process and a 15-minute grace period for the exchanges, and it appears from the record that Gleason remained in the courtroom at that time.

However, as the trial court moved on to ruling on the permanent injunction, the court stated,

> I'm going to note for the record Ms. Gleason has walked out of the courtroom, and I am -- I think given the fact Ms. Gleason has left the courtroom, I don't see why the order awarding sole managing conservatorship for Mr. Heidemeyer should not be granted, and I am doing that. Everything else remains the same. The visits shall be the same, but I am granting Mr. Heidemeyer sole managing conservatorship.

10

On November 13, 2024, the trial court signed the Final Decree that incorporated the rulings made on the record after the close of evidence, including the ruling appointing Heidemeyer as sole managing conservator.

This appeal followed.

## ANALYSIS

In one issue, Gleason asserts that the trial court abused its discretion by (1) naming Heidemeyer as sole managing conservator, (2) requiring Gleason to complete psychological testing, and (3) requiring Gleason's visitation with the children to be supervised.

### Standard of review

Gleason challenges trial-court rulings related to conservatorship and possession. We review this type of challenge to the final decree under an abuse-of-discretion standard. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (reviewing trial court's appointment of father as managing conservator). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion." *Gillespie*, 644 S.W.2d at 451. A trial court abuses its discretion if it acts "without reference to any guiding rules or principles," or in other words, if it acts in an arbitrary or unreasonable manner. *In re J.J.R.S.*, 627 S.W.3d at 218 (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."

11

Tex. Fam. Code § 153.002. Rulings on conservatorship and possession issues are "intensely fact driven." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). Accordingly, "[t]he trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

In family-law cases, the abuse-of-discretion standard overlaps with traditional standards for reviewing the sufficiency of the evidence. *See Zeifman v. Michels*, 212 S.W.3d 582, 587-88 (Tex. App.—Austin 2006, pet. denied). Consequently, legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Id.* at 587. To determine whether the trial court has abused its discretion, we engage in a two-pronged inquiry, analyzing whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) the trial court erred in its application of that discretion. *Id.* at 588. Traditional standards for legal- and factual-sufficiency review come into play with regard to the first question. *Id.*

Under the legal-sufficiency standard, when the appellant attacks the legal sufficiency of an adverse finding on which she did not have the burden of proof, she must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We credit all evidence and inferences favorable to the trial court's decision if a reasonable factfinder could, and we disregard all evidence to the contrary unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* Evidence is legally insufficient when (1) there is a complete absence of a vital fact; (2) rules of law or evidence

preclude giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810, 815-16. Under the factual-sufficiency standard, when the appellant attacks the factual sufficiency of an adverse finding on which she did not have the burden of proof, we consider and weigh all the evidence in the record pertinent to the finding to determine if the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

Because the trial court acts as the factfinder in a bench trial, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court does not abuse its discretion if it bases its decision on conflicting evidence or when evidence of a probative or substantive character exists to support the decision. *Zeifman*, 212 S.W.3d at 587. "The mere fact that a trial court decided an issue in a manner differently than an appellate court would under similar circumstances does not establish an abuse of discretion." *Id.*

With this standard of review in mind, we turn to Gleason's challenge to the trial court's rulings. Gleason, who is represented by counsel on appeal, argues that the facts relevant to her appeal are cumulative and "no one factor or ruling by itself would justify any relief under an abuse of discretion standard of review." She does not point to any evidence that shows that the trial court either lacked sufficient evidence upon which to exercise its discretion or that it erred in its application of that discretion. Instead, in her statement of facts, she attempts to minimize the evidence that supports the trial court's rulings and to emphasize evidence that she asserts favors her contentions that both parties should be named joint managing conservators and

13

that she should not be required to complete a psychological evaluation or to have her possession of the children supervised. Her sole argument is that the trial court "gave too much importance to the very contentious relationship between [Heidemeyer] and [Gleason] in this case."

## I.      Evidence supporting the appointment of Heidemeyer as sole managing conservator

### A.      Gleason's intentional use of abusive physical force against Heidemeyer

As explained above, when ruling on issues of conservatorship, possession, and access, the trial court's primary consideration is the best interest of the child. Tex. Fam. Code § 153.002; *see also Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (enumerating non-exhaustive list of factors that courts consider when "ascertaining the best interest of the child"). The Family Code establishes a "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." Tex. Fam. Code § 153.131(b). In addition, the Family Code mandates as follows:

> In determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force, or evidence of sexual abuse, by a party directed against the party's spouse, a parent of the child, or any person younger than 18 years of age committed within a two-year period preceding the filing of the suit or during the pendency of the suit.

*Id.* § 153.004(a). The record contains evidence of at least three times that Gleason used abusive physical force against Heidemeyer.

Although Gleason acknowledges that the Family Code requires courts to consider whether family violence has occurred, she contends that her November 2022 arrest for assault causing bodily injury to a family member was "a minor incident that took place at the residence

14

of Mr. Heidemeyer and his family," and she implies that it should not have been considered by the trial court because Heidemeyer paid the bond for Gleason to be released and continued to share parenting time with her after the assault. However, Heidemeyer disputed at trial that he continued to share parenting time with Gleason during the time period between her arrest and his filing for divorce in April 2023. He testified that he "did vouch for her," when her counsel asked whether he bailed or bonded her out, and added "[t]hat was solely for the fact that, you know, the children."

The incident that Gleason characterizes as "minor" was described by Heidemeyer in his affidavit as follows:

> On November 3, 2022, while [I was] at my mother's residence with the children, [Gleason] arrived at around 6:00 a.m. to retrieve the children during my period of possession, which period of possession had been previously agreed to by [Gleason]. She was honking her horn and flashing her headlights. She then called law enforcement and left the residence. The police arrived and instructed me to call 911 if she came back to the house. Shortly after, [Gleason] arrived again and banged on the front door until she cracked the glass. I opened the front door to prevent further damage and stood in the doorway to stop [Gleason] from gaining entry. [Gleason] began pushing me, striking me with her elbow repeatedly, and throwing items at me. She threw a clay lawn decoration, which struck my elbow causing me to bleed. [Gleason] attempted to physically attack my sister, and l remained in the doorway to prevent her from harming my sister. The children were upstairs in the home during this incident. My sister called 911, and law enforcement arrived on the scene. This incident resulted in a pending criminal case against [Gleason] in the County Court at Law Number 4, Cause Number C-l-CR-22-501592, in Travis County, Texas, for Assault Causes Bodily Injury to a Family Member.

(Emphases omitted.) Heidemeyer also testified to these details at the hearing and added that during the altercation, Gleason also threw a rock through the front door that hit the back of the house.

Heidemeyer also testified that another altercation had occurred on July 15, 2022. The trial court admitted photographs dated July 15, 2022, of injuries to Heidemeyer including bite marks, scratch marks, and a bruise on the back of the head. Heidemeyer testified that Gleason hit him with a bottle on the back of the head. He further testified that there were "quite a few times" that Gleason was violent towards him during their relationship and that he had never physically harmed her.

Heidemeyer also testified that Gleason hit him in the face in front of their son and Heidemeyer's 15-year-old nephew in the parking lot of the children's daycare in September 2023 on the day that the trial court signed the second ex parte temporary restraining order. He testified that he filed a police report about this incident, too.

**B.      Gleason's failure to regularly exercise her periods of possession**

As Heidemeyer points out, in addition to this evidence of family violence against him that occurred in the two years before the divorce proceeding, he presented other evidence to the trial court that supports his appointment as sole managing conservator, including evidence that Gleason failed to regularly exercise her periods of possession. During the period between May 2023 through September 2023, when the parties were temporary joint managing conservators and Gleason was awarded possession under the standard possession order on the condition that she reside with her parents, she testified that she saw the children only three times for unsupervised periods of possession. After Heidemeyer sought in September 2023 to have Gleason's possession supervised, and Gleason agreed to the Agreed Further Temporary Orders, under which she was to have four three-hour supervised periods of possession to be followed by

16

an assessment and recommendation by Bayar, Gleason attended only four periods of supervised possession between October 2023 and late December 2023, "around New Year's."

Amy Burkholder, the owner of the third-party company that supervised the possession periods testified that those visits were difficult to set up with Gleason and it "wasn't always easy to set up visitations, work within her parameters," regarding "the date, the times, locations, preferences." Gleason argued with Burkholder when Burkholder told her that she could not change the location of Gleason's visits. In her child-custody evaluation, Bayar explained that she had concerns about Gleason's ability to follow the rules about visitations, including the requirement to bring a diaper bag, the need for the visit to occur in one location, showing up on time for the visitations, and leaving during the visits, once for an hour and a half (although other of Gleason's family members remained).

Burkholder testified that Gleason stopped visitation because she repeatedly told Burkholder that she was no longer under an order requiring supervised visitation, but that Burkholder's understanding from Bayar was that Gleason's visitation still was required to be supervised. Bayar testified that because of Gleason's inconsistency with the visits, she never got to the point where Bayar could recommend unsupervised visits. Burkholder testified that after she attempted about once a month for five or six months to reach out to Gleason to schedule further supervised visits, in May, Gleason asked Burkholder to stop communicating with her, and Burkholder complied with that request.

Bayar testified that neither she nor Heidemeyer had prevented Gleason from seeing the children.

17

**C.    Gleason's inability to effectively communicate with Heidemeyer about the children**

Another factor that implicates Gleason's parental abilities is the evidence that she was unable to effectively communicate with Heidemeyer about decisions for the children. *See Holley*, 544 S.W.2d at 372. Heidemeyer testified about and also introduced evidence of the parties' communications on AppClose, the app that the trial court had ordered them to use exclusively to communicate with each other about "matters pertaining to the best interest of the child." Heidemeyer testified that Gleason deleted AppClose three times and that when she deleted the app, he was unable to communicate with her on it about the children. The AppClose messages introduced into evidence show that Gleason's communications with Heidemeyer involved abusive language and threats about not returning the children. She also made threatening phone calls and text messages to Heidemeyer outside of AppClose.

Bayar testified that although she normally prefers to recommend joint managing conservatorship, she recommended sole managing conservatorship because "in this case, I think that due to the parents' current relationship with each other, it makes it very difficult for them to communicate." In particular, Bayar referenced the fact that the children's daycare had made a recommendation (also testified to by Heidemeyer) that the parties' son needed a more one-on-one environment and therefore needed to change daycares, but Gleason would not work with Heidemeyer to agree on a new childcare provider. Because the court orders required the parties to agree on any change to the children's daycare, and Heidemeyer did not want to violate the orders, he ultimately quit his job so that he could stay with the children. Bayar testified that "in reading the AppClose messages, they just didn't get any response regarding changing the

18

daycare, so I do worry that if they are joint managing conservatorship and conservators in this case, that the children's needs won't be met."

Gleason argues that Bayar was too focused on the interactions between her and Heidemeyer instead of the relationship that Gleason has with the children. However, Gleason's inconsistency with exercising her periods of possession and her failure to continue participating in supervised visitation did not provide a basis for Bayar to determine that Gleason's relationship with the children negated her unreliability in exercising possession and her antagonistic relationship with Heidemeyer, which prevented the two from effectively coparenting. *See* Tex. Fam. Code § 153.134(a) (enumerating factors trial court must consider when appointing parents joint managing conservators, including "the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest").

### D. Gleason's behavior and demeanor in open court

Gleason contends that the trial court abused its discretion by changing its ruling about conservatorship after the court initially indicated that it would name the parties joint managing conservators. Gleason acknowledges that she became "very upset at the ruling the court made and left the court room," but nevertheless argues that Family Code Section 153.005, which requires the court to consider whether a party engaged in a history or pattern of family violence or child abuse or neglect, somehow makes the court's change in conservatorship a clear abuse of discretion. Gleason fails to provide any argument explaining why Section 153.005 would require us to find that the trial court's change in ruling is a clear abuse of discretion.

We conclude that Heidemeyer rebutted the presumption that joint managing conservatorship would be in the children's best interest by a preponderance of the evidence. As

19

outlined above, the trial court had before it sufficient evidence to conclude that appointing Heidemeyer as sole managing conservator was in the best interest of the children, including the evidence of Gleason's use of abusive physical force against Heidemeyer, Gleason's inconsistent possession of the children and refusal to participate in supervised visitation, and Gleason's inability to effectively communicate with Heidemeyer about the children's needs. When the trial court initially indicated its intent to appoint the parties as joint managing conservators, it admonished Gleason that she would have to do a lot of work to re-establish her relationship with her children. The trial court did not abuse its discretion by viewing Gleason's subsequent argumentativeness with the trial court, followed by her abrupt departure from the courtroom before the end of the proceedings, as indicative of her inability to be an effective joint managing conservator.

We hold that the trial court did not abuse its discretion by appointing Heidemeyer sole managing conservator.

## II. Evidence supporting the trial court's order that Gleason complete a psychological evaluation

Although Gleason asserts that the trial court should not require her to complete a psychological evaluation, she offers no argument and points to no evidence that suggests that the trial court abused its discretion by including this requirement as part of the step-up possession schedule in the final divorce decree. Instead, the evidence shows that Gleason had never submitted to a psychological evaluation as she had agreed to in the Agreed Further Temporary orders. Also, both Heidemeyer and Bayar testified to concerns about Gleason's mental health. Heidemeyer testified that Gleason told him that she had attempted suicide by overdosing on medication during an episode of postpartum depression before he knew her and that she had once

grabbed a gun and threatened suicide in his presence. Bayar testified that she recommended that Gleason be evaluated in part because Bayar was concerned that Gleason's failure to follow court orders might be indicative of mental-health issues.

We hold that the trial court had sufficient evidence upon which to exercise its discretion and that it did not err in the application of that discretion when it ordered Gleason to complete a psychological evaluation.

### III. Evidence supporting the trial court's order that Gleason's possession periods must be supervised until she completes the requirements of the step-up possession plan

Gleason also contends that the trial court abused its discretion by requiring that her visitation with the children be supervised. Again, she offers no argument and points to no evidence that suggests that the trial court abused its discretion by including this requirement as part of the step-up possession schedule in the final divorce decree. The trial court had ample evidence before it to order supervised visitation as part of a step-up plan of possession.

At the time of the final hearing, Gleason had not had unsupervised possession of the children in over a year. As described above, Gleason had a limited number of supervised visits, and during those visits, she did not parent alone and left during the visits and left the children with family members. Bayar testified that she recommended supervised visitation as part of a step-up possession plan. In part, her recommendation was based on Gleason's criminal history, including a number of law-enforcement calls to Gleason's home involving incidents between Gleason and her family members. Her recommendation was also based on the ages of the children and their need for consistency and on her concern that at the supervised visits, Gleason "was not the primary parent."

21

We hold that the trial court had sufficient evidence upon which to exercise its discretion and that it did not err in the application of that discretion when it ordered Gleason to have supervised visitation of the children as part of a step-up plan of possession.

We overrule Gleason's sole issue on appeal.

## CONCLUSION

Having overruled Gleason's sole issue on appeal, we affirm the challenged portions of the trial court's judgment. All provisions of the trial court's order not specifically challenged on appeal and addressed in this opinion shall remain in full force and effect.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed:   October 24, 2025